IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| LAWRENCE HOPINGS, | CASE NO. 3:23-CV-00980-DAR |
| Petitioner, | JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| WARDEN RYAN WALTERS,[1] | **REPORT AND RECOMMENDATION** |
| Respondent. | |

## INTRODUCTION

Representing himself, Petitioner Lawrence Hopings, a prisoner in state custody, petitioned on April 8, 2023 for a writ of habeas corpus under 28 U.S.C. § 2254. (ECF #1). The District Court has jurisdiction under § 2254(a). On May 23, 2023, under Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry of May 23, 2023).

---

[1] When Mr. Hopings filed his petition, he was incarcerated at the Grafton Correctional Institution. (*See* ECF #1 at PageID 1). While the petition was pending, Mr. Hopings was transferred to Allen-Oakwood Correctional Institution. (ECF #25). A post-filing transfer does not moot the petition so long as there is an alternative respondent with custody inside the Northern District of Ohio. *See White v. Gilley*, No. 6:23-cv-110, 2023 WL 5987206, at *3 (E.D. Ky. Sept. 13, 2023). I take judicial notice that the Ohio Department of Rehabilitation and Corrections' official government website locates that facility in Allen County, Ohio and it lists Ryan Walters as the current warden of that facility. *See Allen-Oakwood Correctional Institution (AOCI), Ohio Dept. of Rehab. & Corr.*, http://drc.ohio.gov/about/facilities/allen-oakwood/allen-oakwood (last accessed Jan. 16, 2025). Because Allen County is within this judicial district, *see* 28 U.S.C. § 115(a)(2), I substitute Warden Walters as the proper respondent under Fed. R. Civ. P. 25.

1

On May 30, 2023, then-Respondent Warden Keith Foley, as Warden of the Grafton Correctional Institution (hereinafter, the State), moved under Fed. R. Civ. P. 12(e) for a more definite statement noting that Mr. Hopings's petition listed "N/A" for each ground for relief and stated no supporting facts. (ECF #8; ECF #1 at PageID 5-6, 8-9). On May 31, 2023, I ordered Mr. Hopings to file an amended petition with a concise statement of each ground for relief with supporting facts. (ECF #9). On July 13, 2023, Mr. Hopings filed an amended petition. (ECF #11). On October 31, 2023, the State filed the Return of Writ, including the state-court record and trial transcripts. (*See* ECF #15). On November 6, 2023, the State filed a corrected state-court record that included an inadvertently omitted exhibit. (ECF #16).

On November 27, 2023, Mr. Hopings moved for leave to file a second amended petition (ECF #17) and to stay proceedings while that motion was pending (ECF #18). That same day, Mr. Hopings filed a second amended petition. (ECF #21). On December 14, 2023, I denied the stay and leave to amend because the second amended petition raised a new ground for relief that was procedurally defaulted and the remaining grounds for relief in both the first and second amended petitions were substantially identical. (ECF #22 at PageID 1377-80). On January 12, 2024, Mr. Hopings filed the Traverse to the Return of Writ. (ECF #24).

As explained below, I recommend the District Court **DISMISS** portions of Ground One and the entirety of Ground Four as procedurally defaulted, **DENY** the rest of Ground One and the entirety of Grounds Two and Three as meritless, **DISMISS** Mr. Hopings's habeas petition, and **DENY** Mr. Hopings a certificate of appealability (COA).

PROCEDURAL HISTORY

**I.    State court factual findings**

The factual findings of the Ohio Court of Appeals, Sixth District, made on direct appeal

are presumed correct unless Mr. Hopings rebuts that presumption by clear and convincing

evidence. 28 U.S.C. § 2254(e)(1). In its opinion affirming Mr. Hopings's convictions, the Sixth

District found:

> {¶2} Appellant's convictions were based on conduct which occurred between April
> 1, 2016 and April 30, 2017. Appellant was initially indicted in 2017. The original
> indictment was dismissed in 2018, without prejudice, at the state's request. Appellant
> was again indicted in 2019 for the same conduct. The refiled indictment ultimately
> proceeded to trial, from which the final judgment is the subject of this appeal.
> Because appellant alleges errors which encompass the procedure under both the
> original and the refiled indictments, the following summary provides the procedural
> details under both case numbers.
>
> **i. Lucas County Court of Common Pleas Case No. CR 2017-2020**
>
> {¶3} On June 16, 2017, appellant was indicted on three counts of rape by force or
> threat of force in violation of R.C. 2907.02(A)(2) and (B), each a first-degree felony;
> and three counts of sexual battery in violation of R.C. 2907.03(A)(5) and (B), each a
> third-degree felony. The charges were assigned Lucas County Court of Common
> Pleas case No. CR 2017-2020. Appellant was arrested that same day. Appellant was
> arraigned on June 19, 2017, was appointed counsel, and entered a not guilty plea to
> all counts. The trial court set appellant's bond in the amount of $525,000 and
> appellant was remanded into the custody of the Lucas County Sheriff's Department.
> The trial court also set appellant's trial for August 1, 2017.
>
> {¶4} On that date, appellant requested a continuance of the trial date. The trial court
> granted appellant's request and continued the trial to September 12, 2017. On the
> rescheduled trial date, appellant again requested a continuance which the trial court
> granted. The case was rescheduled for trial on November 28, 2017.
>
> {¶5} The state appeared for the newly scheduled trial date and informed the trial
> court that the victim, L.S., was taking part in residential mental health treatment and
> would not be prepared to testify. Because of this, the state made its first request to
> continue the trial date. The trial court granted the state's request over appellant's
> objection. Appellant's trial was rescheduled for January 30, 2018. On that
> rescheduled trial date, the state informed the trial court that L.S. was still unable to
> testify and requested the trial court dismiss the charges, without prejudice. The trial

3

court granted the state's request. From the time of his arrest to the dismissal of the charges, appellant was held in jail in lieu of bail for a total of 277 days.

### ii. Lucas County Court of Common Pleas Case No. CR-2019-2802

{¶6} The state again indicted appellant on identical charges on October 16, 2019. The refiled charges were assigned Lucas County Court of Common Pleas case No. CR 2019-2802. Appellant was arraigned on the refiled charges on October 23, 2019. He was again appointed counsel and entered a not guilty plea to all counts. The trial court set appellant's bond in the amount of $750,000 and appellant was remanded into the custody of the Lucas County Sheriff's Department. The trial court also set a pretrial for October 30, 2019. At that pretrial, appellant signed a written waiver of his speedy trial rights and consented to a rescheduled trial date of January 7, 2020.

{¶7} On January 6, 2020, appellant filed a motion to dismiss the charges. Appellant's motion included a letter signed by L.S., dated August 1, 2017, in which she purportedly recanted all of her allegations. The letter stated that L.S. lied about appellant's conduct as revenge for his shortcomings in their father-daughter relationship. Appellant's motion sought dismissal of all charges arguing that the letter "fully exonerates [appellant]." The state filed its opposition on January 21, 2020. The state argued that a motion to dismiss pursuant to Crim.R. 12(C) was limited to challenging the sufficiency of the indictment and could not be used to show that the state would be unable to prove the elements of the offense at trial. The trial court ultimately denied appellant's motion with an entry dated January 24, 2020, basing its decision on the grounds argued by the state.

{¶8} Contemporaneous with the motion practice, appellant and the state appeared for the January 7, 2020 trial date. There, appellant requested, and the trial court granted, a continuance of the trial to January 28, 2020. On that date, the state informed the trial court that L.S. had undergone a minor medical procedure and was unavailable. The state requested a continuance to February 18, 2020. Appellant did not object to the state's request and the trial court granted the continuance.

{¶9} On the morning of appellant's February 18, 2020 trial date, the state filed a motion to amend the indictments to reflect that the conduct supporting each count occurred between April 1, 2016 and April 30, 2017. Appellant informed the trial court that it did not object to the amendment and the motion was granted the same day. Appellant then requested another continuance to investigate additional information regarding recently disclosed witnesses and the subject of their testimony. The trial court granted appellant's request and set the matter for trial on March 10, 2020—the date on which appellant's trial commenced. From the time of his arrest on the refiled charges to the commencement of trial, appellant had been held in jail in lieu of bail for a total of 146 days.

4

**Jury Selection and Trial Commencement**

{¶10} A three-day trial commenced on March 10, 2020. Initially, the parties proceeded to select 12 jurors and 2 alternates from the venire. After jury selection, the proceedings were recessed for approximately one hour before opening statements were to begin.

{¶11} Upon returning from recess, counsel for appellant and the prosecutor met in the trial court's chambers for a discussion outside the presence of the jury. During that discussion, the prosecutor informed the trial court that as he was returning to the courtroom, an individual he believed had just been selected for the jury saw him in the hallway and asked "did [appellant] take a plea so we can all go home?" The prosecutor believed that other members of the jury were present for the comment but stated that he needed to see the panel again before he could confirm any of their identities. The parties agreed to have the trial court's bailiff begin seating the jury in the jury box and allow the prosecutor to determine if the individual that spoke to him was indeed a member of the jury. The prosecutor confirmed that it was Juror Number 12 that had made the comment but was unable to determine if any other jurors were present at that time. The parties agreed to conduct a separate, in-chambers voir dire of Juror Number 12 to determine whether her statement impacted her ability to continue serving on the jury.

{¶12} During her individual voir dire, Juror Number 12 indicated that she made the comment because she thought appellant may have agreed to a plea deal which would have relieved the panel of their jury service. Regarding the nature of the statement, Juror Number 12 stated "I was just making a joke," "it was strictly a joke," and "we thought perhaps a plea had happened." When the trial court asked if she could still "sit and listen to the evidence," juror number 12 stated "[o]h, yes." After Juror Number 12 exited the chambers, appellant's counsel stated:

> Judge, given that comment and the context in which it was made, and given the fact that she was here and that I saw her, it sounds worse than it is. * * * But based upon what was said, I believe it to be a comment made out of being facetious or maybe even nervous, and I don't—I don't believe she can be anything but fair and impartial given her answers not just here in your chambers but out in the courtroom as well[.]

The trial court agreed and permitted Juror Number 12 to continue her service on the jury. The trial court also indicated that to avoid singling Juror Number 12 out in open court that the preliminary jury instructions would include an advisement that jurors were not permitted to speak with any counsel during the trial.

{¶13} The parties then proceeded to the courtroom for the commencement of appellant's trial at which the parties elicited the following testimony and related evidence:

### Testimony of L.S.

{¶14} L.S. was born on October 26, 2001. At the time of the trial, she was in the custody of the Lucas County Children's Services Department ("LCCS"). Appellant is L.S.'s biological father. From the time she was born until she was 14 years old, L.S. lived with her grandmother. She did not have any contact with appellant during that time.

{¶15} In the Spring of 2016, at the age of 14, L.S. reached out to appellant in order to establish a father-daughter relationship. She initially contacted appellant via text messaging but began meeting him in person approximately one month later.

{¶16} L.S. testified that appellant began sexually abusing her in April of 2016. The first incident occurred while she was visiting appellant at his father's residence in Toledo, Ohio. While watching a movie, appellant sat down behind L.S. and removed her pants and underwear. He then repeatedly pulled L.S.'s head back, told her to "take it like a woman," and proceeded to have vaginal intercourse with her. L.S. was eventually able to get away from appellant who then stated, "I should have never did that." The following morning, L.S. found blood in her underwear. L.S. did not report this incident to anyone.

{¶17} At the time of this first incident, L.S. was living with her aunt and cousin. After experiencing physical and verbal abuse there, she moved in with another aunt, M.D. Appellant was also living with M.D. at that same time. L.S. and appellant each had their own room at M.D.'s house. However, appellant soon moved into L.S.'s room with her claiming that the odor of cat urine prevented him from staying in his room. L.S. testified that while living with M.D., appellant continued to have vaginal intercourse with her "plenty of times." He also performed oral sex on L.S. and had her perform oral sex on him. L.S. testified that most often she did not resist because if she did, he "would just take it." L.S. also testified that appellant would "always" tell her not to tell anyone about his conduct or he would stop talking to her and that "it won't turn out good." She also testified that when she was more forceful with her resistance that appellant would "beat on [her]."

{¶18} L.S. later described an incident which occurred in July of 2016, at her cousin's residence. While attending a family gather, appellant had approached a table L.S. was sitting at and sat down. L.S. then sat on his lap. Before she got up, appellant told her, "Tonight we gonna do this." L.S. stood up to leave and appellant responded by showing her his penis. He covered himself when he heard others coming into the room. Later, while L.S. was holding a relative's baby, appellant took the baby from her, laid the baby on the couch, forced himself on top of L.S. and had vaginal

6

intercourse with her. Appellant was interrupted when another relative came to pick up the baby who was now crying. Appellant stopped having sex with L.S. and they both quickly dressed when they heard the relative approaching.

{¶19} On another occasion, L.S. and appellant were again visiting his dad's residence. L.S. testified that she went upstairs to use the restroom and appellant followed her. He pulled her into a bedroom and forcibly engaged in vaginal intercourse with her. She eventually pulled herself away from him and he said, "don't do this to daddy." L.S. refused to continue. She testified that she was bleeding from her vagina which she attributed to the force of the intercourse.

{¶20} Overall, L.S. testified that appellant had vaginal and oral sex with her on multiple occasions at five different residences between April 1, 2016 and April 1, 2017. L.S. eventually moved from M.D.'s house where she shared a room with her father to her brother's house. She subsequently contacted Kaitlin Middleton, a crisis care manager at the Zepf Mental Health Center, with whom L.S. had previously worked with following previous suicide attempts. L.S. asked Middleton to come to her brother's residence to discuss ongoing issues.

{¶21} During the discussion, Middleton reminded L.S. that during one of her previous hospitalizations, L.S. had allowed the Middleton to review the contents of her cell phone and iPad. This review was the result of L.S. informing Middleton that appellant had previously touched her buttocks. At that time, L.S. had not informed Middleton of any other sexual conduct between her and appellant. The contents of L.S.'s devices included a video in which appellant describes L.S. as "fine" and addresses her as his "baby mama," which L.S. interpreted as appellant's desire to impregnate her. L.S. testified that after Middleton reminded her that she had already seen the contents of her phone, she informed Middleton that appellant had, in fact, engaged in sexual contact with her over "200 times." On cross-examination she conceded that this amount was hyperbolic and exceeded the "50 to 100 times" estimate she initially reported to police in 2017.

{¶22} After informing Middleton of appellant's conduct, L.S. was moved into foster care through LCCS. On May 27, 2017, with Middleton's encouragement, L.S. sent a text message to appellant informing him that she had disclosed his conduct to Middleton. Appellant and L.S. engaged in a text conversation in which appellant immediately responded that he was "going to jail." Later in the exchange, appellant denied he ever had sex with L.S. and that she "better tell them [she] lied." In one exchange, L.S. told appellant that she and appellant had only had sex once. During her testimony, L.S. identified this as an intentional misstatement. She testified that Middleton suggested that she not divulge the entirety of her disclosure because she was afraid of how appellant and his family would respond. A printout of the text conversations between L.S. and appellant following her reporting of appellant's conduct to Middleton was admitted into evidence as State's Exhibit 5.

{¶23} During her testimony, L.S. was presented with her August 1, 2017 letter in which she recanted her allegations against appellant. In the letter, L.S. stated that her allegations were revenge for what she perceived as appellant's failures as a father. L.S. testified that the letter itself was false and that she felt pressured to recant her story because of how appellant and his family and friends responded to her allegations and anticipated testimony.

{¶24} Finally, L.S. testified that when appellant's initial trial had been scheduled for January 30, 2018 (case No. CR 2017-2020), she was receiving inpatient treatment at a mental health facility and was unable to testify. In 2019, after completing her treatment, L.S. contacted Detective Michael Taulton of the Toledo Police Department regarding her allegations. Detective Taulton had originally interviewed L.S. in relation to appellant's conduct. Detective Taulton again interviewed L.S. prior to the charges being refiled. She informed Detective Taulton that she had decided to testify against appellant because she believed it was "time to get the truth out" about his conduct. L.S. concluded her testimony by stating there were "at least" 14 different locations where appellant engaged in sexual conduct with her.

### Testimony of Kaitlin Middleton

{¶25} At all times relevant to this case, Kaitlin Middleton worked as a crisis care manager at the Zepf Mental Health Center in Toledo, Ohio. Her work at the center involved meeting with juvenile clients that had recently been released from hospital treatment for their suicidal or homicidal ideations. Middleton would meet with the clients to monitor their symptoms and behaviors, ensure they received their medication and attended therapy appointments, and help establish additional treatment options if necessary.

{¶26} Middleton first met L.S. in her capacity as a crisis care manager on February 14, 2017. L.S. had previously been hospitalized for mental health treatment after exhibiting suicidal ideations. Middleton met with L.S. to develop a crisis plan following her recent release from treatment. Middleton continued to meet with L.S. at appellant's residence twice a week. During that time, Middleton informed appellant that it was important for him to be involved in L.S.'s treatment by monitoring her closely. Middleton also noted that appellant would not leave L.S. alone with her at any time during their visits. Middleton testified that this was suggestive of an abusive relationship because it was "unusual" for a parent to insist on being involved in these sessions. She conceded, however, that a lack of involvement by appellant would have also been concerning.

{¶27} At one of her later visits, L.S. reported that appellant was sexually abusing her. Middleton was obligated by law to report this abuse to LCCS. After making the report, Middleton arranged hospitalization treatment for L.S. who had informed Middleton that she felt unsafe with appellant and was exhibiting behavior that

indicated she might harm herself. Middleton arranged L.S.'s admission to the University of Toledo's Kobacker mental health facility in Toledo, Ohio.

### Testimony of Detective Michael Taulton

{¶28} Detective Michael Taulton had been a member of the Toledo Police Department for 23 years at the time of appellant's trial. At that time, he worked as an investigator for the Special Victims Unit ("SVU") and was tasked with investigating sexual crimes. He testified that the SVU exists because sexual crimes are particularly sensitive and their investigation requires specialized training. Specifically, he was trained to conduct "forensic interviews" with children who alleged that they have been the victim of sexual abuse. In contrast to interviewing an adult, in which the questions are designed to elicit affirmative admissions and denials, a forensic interview of a child involves asking open-ended questions with narrative responses. Detective Taulton stated that this method was preferred because children often simply agree with the interviewer if asked questions which suggest a certain response rather than providing an honest answer.

{¶29} Detective Taulton also noted that in his experience, child victims of sexual abuse may delay reporting abuse because they fear abuse from other family members or an escalation of the abuse which is already occurring. He noted his observation that this was common in intra-family abuse cases. He also testified that children sometimes recant their allegations for various reasons other than that they were false. These reasons include the resulting disruption in their household activities, pressure from others in the family, and confusion about being abused by loved ones.

{¶30} As to his investigation in appellant's case, Detective Taulton testified that he conducted a forensic interview with L.S. both in 2017 and 2019 regarding her allegations. He noted that despite L.S.'s testimony that appellant had had sex with her over 200 times that she had initially reported that it occurred 50 to 100 times. After his interview with L.S., Taulton conducted a data extraction of cell phones belonging to L.S. and appellant as well as L.S.'s iPad. He confirmed that State's Exhibit 5, which included the text messages L.S. described during her testimony, was a report derived from these extractions.

{¶31} Detective Taulton further testified that when he interviewed appellant that appellant denied all of L.S.'s allegations. Detective Taulton stated that this was a common response when he interviewed an individual accused of sexual abuse. He conceded during cross-examination, however, that he had heard similar denials during his previous investigations of property theft cases and that such a denial was not exclusive to sexual abuse cases.

{¶32} Finally, Taulton testified that based on his interviews and his review of the data extracted from the parties' devices, he believed a criminal offense had occurred and referred the matter to the state for prosecution.

**Testimony of L.G. and M.D**

{¶33} Appellant called two witnesses—L.G. and M.D., appellant's aunts—during his case-in-chief. Each of these witnesses testified that they resided with appellant and L.S. at some point during the times relevant to this case. Each testified that they did not observe appellant engaging in any inappropriate conduct with L.S. and that the living space provided allowed for L.S. and appellant to have their own rooms. Both L.G. and M.D. conceded that they did not observe appellant and L.S. at all times and that L.S.'s allegations regarding appellant's conduct could have occurred during those unobserved times.

(ECF #16-1 at PageID 1108-21; *State v. Hopings*, No. L-20-1075, 2022 WL 1439828, at *1-6 (Ohio Ct. App. May 6, 2022), *appeal not allowed*, 192 N.E.3d 513 (Ohio 2022) (table) (footnote omitted, substitution and ellipses in original)).

## II.     Trial court proceedings

On October 16, 2019, a Lucas County grand jury indicted Mr. Hopings for three counts of rape and three counts of sexual battery. (ECF #16-1 at PageID 983-85). On October 24, 2019, Mr. Hopings was arraigned, declared indigent, appointed counsel, and pled not guilty. (*Id.* at PageID 987). On October 30, 2019, Mr. Hopings waived his right to a speedy trial to a trial date of January 7, 2020. (*Id.* at PageID 988).

On January 6, 2020, Mr. Hopings moved to dismiss the indictment, attaching a letter from the victim recanting her allegations that Mr. Hopings had raped her, claiming she invented them to seek revenge, and accusing another person. (*Id.* at PageID 990-92). The trial court denied the motion, concluding Ohio Criminal Rule 12(C) does not allow a defendant to challenge before trial the merits or substance of the allegations against him. (*Id.* at PageID 998-1000). After a two-day trial (*see* ECF #15-2 at PageID 535-956), the jury convicted Mr. Hopings on all six counts. (ECF #16-1 at PageID 1014). The trial court sentenced Mr. Hopings to 11 years' imprisonment for each rape count and 60 months' imprisonment for each sexual battery count. (*Id.* at PageID 1015).

10

The trial court ordered the sentences to be served consecutively, resulting in an aggregate sentence of 48 years' imprisonment, with 30 years mandatory. (*See id.* at PageID 1015-16).

III. **Direct appeal**

On April 2, 2020, through new counsel, Mr. Hopings filed a Notice of Appeal with the Sixth District. (ECF #16-1 at PageID 1019). He raised four assignments of error:

> **ASSIGNMENT OF ERROR 1:**
> Trial counsel for [Mr. Hopings] was ineffective and did not achieve or provide the minimum constitutionally mandated standard for representation of [him] at the trial of this cause.
>
> **ASSIGNMENT OF ERROR 2:**
> Failure to contest seating juror who made comment to the prosecutor indicating favor for [Mr. Hopings] taking a plea during jury selection.
>
> **ASSIGNMENT OF ERROR 3:**
> [Mr. Hopings] is entitled to have this case dismissed and to be released due to the violation of his speedy-trial rights pursuant to the United States and Ohio constitutions.
>
> **ASSIGNMENT OF ERROR 4:**
> The convictions for rape and sexual battery are offenses of similar import and the jury did not identify the "separate" nature of the offenses for which [Mr. Hopings] stands convicted.

(*Id.* at PageID 1024) (cleaned up). On May 6, 2022, the Sixth District affirmed Mr. Hopings's convictions and sentence. (*Id.* at PageID 1107-42; *see also Hopings*, 2022 WL 1439828).

On June 8, 2022, Mr. Hopings, representing himself, appealed the Sixth District's judgment to the Supreme Court of Ohio. (ECF #16-1 at PageID 1143) In his memorandum in support of jurisdiction, Mr. Hopings set forth four propositions of law:

> **PROPOSITION OF LAW I:**
> Where trial counsel commits multiple significant and obvious errors that cumulatively prejudice the defense at trial, such counsel is constitutionally ineffective under the Sixth and Fourteenth Amendments.

**PROPOSITION OF LAW II:**
Where a juror who expresses belief in the defendant's guilt is permitted to sit on the jury, the defendant has been denied his right to an impartial jury under the Sixth Amendment.

**PROPOSITION OF LAW III:**
Where a trial in a criminal case is not held within the statutory and constitutional time for a speedy trial, a resulting conviction is violative of the Sixth Amendment.

**PROPOSITION OF LAW IV:**
Where a defendant is sentenced more than once for the same conduct, such sentence violates the Double Jeopardy proscription of the Fifth Amendment.

(*Id.* at PageID 1145). On August 16, 2022, the Supreme Court of Ohio declined jurisdiction. (*Id.*

at PageID 1213; *see also State v. Hopings*, 192 N.E.3d 513 (Ohio 2022) (table)). Mr. Hopings did not

further appeal his conviction to the Supreme Court of the United States.

**IV.     Application to reopen the direct appeal**

On July 8, 2022, while his appeal to the Supreme Court of Ohio was pending, Mr.

Hopings, representing himself, applied to reopen his direct appeal under Ohio Appellate Rule

26(B). (ECF #16-1 at PageID 1214). Mr. Hopings argued his appellate counsel was ineffective for

not raising four proposed assignments of error:

**PROPOSED ASSIGNMENT OF ERROR 1:**
Mr. Hopings was deprived of the due process of law and of his Double Jeopardy protections guaranteed by the Fifth, Sixth, and Fourteenth Amendments by the inclusion of multiple undifferentiated counts in the indictment.

**PROPOSED ASSIGNMENT OF ERROR 2:**
The verdict in this case is unsupported by the manifest weight of the evidence and the trier of fact clearly lost its way. Violation of the due process of law.

**PROPOSED ASSIGNMENT OF ERROR 3:**
Mr. Hopings was deprived of the due process of law by the misconduct of the prosecutor during closing arguments.

**PROPOSED ASSIGNMENT OF ERROR 4:**
Mr. Hopings was deprived of a fair trial and the due process of law by the trial court permitting bolstering opinion testimony from a social worker at trial.

(*Id.* at PageID 1216-19) (cleaned up). Though not captioned as a proposed assignment of error, Mr. Hopings also argued his appellate counsel was ineffective for omitting from his ineffective-assistance claim his trial counsel's failures to request discovery and properly object to (1) the duplicative indictment, (2) the jury being all white and three-quarters female, (3) the bolstering opinion testimony of the social worker, (4) prosecutorial misconduct during closing argument, and (5) the application of Ohio's Rape Shield Law. (*Id.* at PageID 1220-24).

On February 3, 2023, Mr. Hopings filed a "Motion for Leave to Amend Appellant's 26B with Good Causes Shown." (*Id.* at PageID 1242). There, he proposed three more assignments of error:

> **PROPOSED ASSIGNMENT OF ERROR 5:**
> This Court must reopen Appellant's direct appeal because this court failed to give Mr. Hopings three days for each day he sat in jail this court of appeals court only gave appellant one day for each day he sat in jail was error.
>
> **PROPOSED ASSIGNMENT OF ERROR 6:**
> The trial court erred when it did not impose a sentence under [Ohio's Reagan Tokes Law].
>
> **PROPOSED ASSIGNMENT OF ERROR 7:**
> Trial court ordered Appellant to be released after serving 33 years at his sentencing hearing although the trial court imposed a sentence of 48 years.

(*Id.* at PageID 1244, 1246, 1248). On April 11, 2023, Mr. Hopings filed a "Motion for Leave of Court to Supplement App.R. 26(B) Reopening" where he requested to attach two briefs from his appellate counsel. (*Id.* at PageID 1261). On May 24, 2023, the Sixth District denied Mr. Hopings's application to reopen his direct appeal and denied his two other motions as procedurally improper. (*Id.* at PageID 1262, 1267-78).

## FEDERAL HABEAS PETITION

On April 6, 2023, Mr. Hopings placed his habeas petition in the prison mailing system.

(ECF #1 at PageID 13). His petition listed "N/A" for each ground for relief and stated no

supporting facts. (*See id.* at PageID 5-6, 8-9). On July 13, 2023, Mr. Hopings filed an amended

petition. (ECF #11). There, he raises four assignments of error, which I recast as grounds for relief:

> **GROUND ONE:**
> Trial counsel for the Defendant, Appellant herein, was ineffective and did not achieve or provide the minimum constitutionally mandated standard for representation of Defendant at the trial of this cause.
>
> **GROUND TWO:**
> (This Assignment of Error falls in the ineffective assistance argument but it is so egregious and goes to the very core of constitutional guarantees that it is segregated here) Failure to contest seating juror who made comment to the prosecutor indicating favor for Defendant taking a plea during jury selection.
>
> **GROUND THREE:**
> Appellant is entitled to have this case dismissed and to be released due to the violation of his speedy trial rights, pursuant to the United States and Ohio Constitutions.
>
> **GROUND FOUR:**
> The convictions for rape and sexual battery are offenses of similar import and the jury did not identify the "separate" nature of the offenses for which the Appellant stands convicted.

(*Id.* at PageID 53, 63, 68, 74) (emphasis omitted).

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Mr.

Hopings's petition for writ of habeas corpus. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA

recognizes that "[s]tate courts are adequate forums for the vindication of federal rights" and

therefore acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been

adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). It "dictates a highly deferential

standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citation and quotation omitted). Accordingly, an application for habeas corpus cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

Habeas courts review the last explained state-court judgment on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991). For the purposes of § 2254(d)(1), "clearly established federal law" is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "the holdings, as opposed to dicta, of [Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state-court decision is contrary to Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Id.* at 405; *White v. Mitchell*, 431 F.3d 517, 523 (6th Cir. 2005). The word "contrary" means "diametrically different, opposite in character or nature, or mutually opposed." *Williams*, 529 U.S. at 405. A state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision involves an unreasonable application of the Supreme Court's precedent if the state court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the state prisoner's case, or if the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not be applied or unreasonably refuses to extend that principle in a new context where it should apply. *Williams*, 529 U.S. at 407. The proper measure of whether a state-court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Id.* at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Under § 2254(d)(2), state court factual determinations stand unless they are objectively unreasonable in light of the evidence presented in state court. *Id.* at 100. The Supreme Court has repeatedly emphasized "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." *Burt*, 571 U.S. at 18. Under AEDPA, "a determination of a factual issue made by a state court shall be presumed to be correct. [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2554(e)(1).

Comity principles also require federal courts to defer to a state's judgment on issues of state substantive and procedural law. *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-29 (1982). Federal courts must accept a state court's interpretation of its statutes and rules of practice. *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

The standard is intended to be difficult to meet and reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Harrington*, 562 U.S. at 102-03; *see also Brown v. Davenport*, 596 U.S. 118, 133 (2022) (describing habeas as an "extraordinary remedy, reserved for only extreme malfunctions in the state criminal justice system and different in kind from providing relief on direct appeal") (cleaned up). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

### PROCEDURAL BARRIERS TO FEDERAL HABEAS REVIEW

Before a federal court may review a petitioner's habeas claims on the merits, the petitioner must overcome several procedural barriers. These barriers, including exhaustion of state remedies and procedural default, limit a petitioner's access to review on the merits of a constitutional claim. *Daniels v. United States*, 532 U.S. 374, 381 (2001). Put simply, federal courts may review federal claims that were evaluated on the merits by a state court. Claims that were not evaluated on the merits, either because they were never presented to the state courts (*i.e.*, they are unexhausted) or because they were not properly presented to the state courts (*i.e.*, they are procedurally defaulted), are generally not cognizable on federal habeas review. *Bonnell v. Mitchel*, 301 F.Supp.2d 698, 722 (N.D. Ohio Feb. 4, 2004).

**Exhaustion of Available State Court Remedies**. A court may not grant a petition for habeas corpus unless the petitioner has exhausted available state court remedies, state corrective process is unavailable, or circumstances exist rendering such state process ineffective to protect the

petitioner's rights. 28 U.S.C. § 2254(b)(1). Typically, the exhaustion requirement is satisfied when the petitioner fairly presents all claims to the highest court in the state in where petitioner was convicted, giving the state a full and fair opportunity to rule on the petitioner's claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). A claim is fairly presented when both the factual and legal basis for the claim has been introduced to the state courts. *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2000). A failure to exhaust applies only where state remedies remain "available at the time of the federal petition." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). In contrast, where state court remedies are no longer available, procedural default (discussed more fully below), rather than exhaustion, applies. *Id.*

**Procedural Default**. Absent a petitioner showing either cause and prejudice or that failure to review the claim would result in a fundamental miscarriage of justice (discussed below), a federal court will not consider the merits of procedurally defaulted claims. *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

There are two avenues by which a petitioner's claim may be procedurally defaulted. *Williams*, 460 F.3d at 806. First, procedural default occurs if a petitioner "fails to comply with state procedural rules in presenting his claim to the appropriate state court." *Id.* To determine whether a petitioner's failure to comply with a state procedural rule bars review of his habeas claims, courts in the Sixth Circuit perform a four-pronged analysis: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner disregarded that rule; (2) whether the state court enforced the procedural rule; (3) whether the procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can show cause for his failure to follow the rule and that he

was actually prejudiced by the alleged constitutional error. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Second, a claim may be procedurally defaulted when the petitioner fails to raise it in state court and pursue it through the state's "ordinary appellate review procedures." *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 848 (1991)); *see also Baston v. Bagley*, 282 F.Supp.2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). As addressed above, "[i]f, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id.* Although the exhaustion requirement is satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims, barring federal court review. *Williams*, 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice because of the alleged violation of federal law or show that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749. Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default; they must present affirmative evidence or argument about the precise cause and prejudice produced. *See Tinsley v. Million*, 399 F.3d 796, 806 (6th Cir. 2005) (citing *Northland Ins. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452 (6th Cir. 2003) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at a developed argumentation, are deemed waived.") (quotation omitted)). A finding of cause and prejudice does not entitle a petitioner to habeas relief; it merely allows a federal court to consider the merits of a claim that otherwise would

have been procedurally defaulted. *See Martinez v. Ryan*, 566 U.S. 1, 10 (2012); *see also Coleman*, 501 U.S. at 750.

A showing of cause for the default requires more than the mere proffer of an excuse. Rather, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488; *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012). Neither a petitioner's pro se status nor his ignorance of the law and procedural filing requirements are enough to show cause to overcome procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004).

To demonstrate prejudice sufficient to overcome procedural default, a petitioner must show more than mere errors in the state trial creating a possibility of prejudice. *Murray*, 477 U.S. at 494. Rather, the petitioner must show that the alleged errors worked to the petitioner's actual and substantial disadvantage, infecting the entire trial with error of constitutional dimensions. *Id.* There is no prejudice where the petitioner does not show a reasonable probability that the result of the proceeding would have been different. *Ambrose v. Booker*, 801 F.3d 567, 577-78 (6th Cir. 2015).

Alternatively, a petitioner may overcome procedural default by showing that a fundamental miscarriage of justice will occur if the claims are not considered. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 495. A fundamental miscarriage of justice occurs in the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 495-96; *see also Schlup v. Delo*, 513 U.S. 298, 327 (1995). Actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). A valid actual innocence claim must be supported by new reliable evidence, such as

20

exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence, that was not presented at trial and is so strong a court cannot have confidence in the outcome of the petitioner's trial. *Schlup*, 513 U.S. at 324. In other words, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327.

  **State-Law Claims Not Cognizable on Federal Habeas Review**. The District Court will not have jurisdiction over a petitioner's claims for purposes of habeas corpus review if the claims do not "challenge the legality of his custody" based on a "violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). Indeed, "[t]he writ of habeas corpus is not available to remedy errors of only state law." *Smith v. Morgan*, 371 F.App'x 575, 582 (6th Cir. 2010) (citing 28 U.S.C. § 2254(a)); *see also Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998) ("A claim based solely on an error of state law is not redressable through the federal habeas process."); *see also Rivera v. Illinois*, 556 U.S. 148, 158 (2009) ("The Due Process Clause . . . safeguards not the meticulous observance of state procedural prescriptions, but the fundamental elements of fairness in a criminal trial.") (quotation omitted); *see also Engle*, 456 U.S. at 121 n.21 ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted). Moreover, merely asserting that a state-law error violates the federal constitution cannot by itself justify jurisdiction. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010). "A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see also Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (stating that a federal habeas court does not function as another state appellate court reviewing state courts' decisions on state law or procedure).

Even so, habeas relief may be available if an alleged error of state law subjected the petitioner to a "fundamentally unfair" criminal process. *Williams*, 460 F.3d at 816. "[T]he category of infractions that violate fundamental fairness is defined very narrowly," and includes only state rulings that "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Bey v. Bagley*, 500 F.3d 514, 521 (6th Cir. 2007) (cleaned up). The habeas petitioner bears the burden of showing "the principle of procedure violated by the rule (and allegedly required by due process)" is fundamental. *Bey*, 500 F.3d at 521.

## ANALYSIS

The State argues Mr. Hopings has procedurally defaulted parts of Ground One and all of Ground Four because he did not exhaust all the alleged errors by his trial counsel, and he did not object to the multiple sentences during the sentencing hearing. (ECF #15 at PageID 109-14). The State further argues Ground One and Two are meritless and Ground Three and Four are not cognizable on federal habeas review. (*See id.* at PageID 116-17, 128, 129, 135).

## I.  Procedural default of portions of Ground One and all of Ground Four

### A.  Some errors by trial counsel named in Ground One are procedurally defaulted because Mr. Hopings did not raise them before the Supreme Court of Ohio

In Ground One of his amended petition, Mr. Hopings argues his trial counsel's performance was defective and identifies over 40 alleged errors. (ECF #11 at PageID 54-63). The State concedes "most of [Mr.] Hopings's claims against his trial counsel were presented to both the court of appeals and Ohio Supreme Court" but the State argues Mr. Hopings did not exhaust some of these errors and those are now procedurally defaulted. (ECF #15 at PageID 109) (citing ECF #11 at PageID 59-63). Mr. Hopings responds that he raised the substance of the claim in his memorandum in support of jurisdiction before the Supreme Court of Ohio, though the list may

not have been a word-for-word match. (ECF #24 at PageID 1386) (citing ECF #16-1 at PageID 1150-51).

As discussed above, a petitioner may procedurally default a claim by not raising it in state court and pursuing it at each level of the state courts' review. *See Baston*, 282 F.Supp.2d at 661. A petitioner must also present the claim "to the state under the same theory in which it is later presented in federal court. *See Hicks v. Straub,* 377 F.3d 538, 552-53 (6th Cir. 2004). It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made. *Anderson v. Harless*, 459 U.S. 4, 6 (1982). Applied to ineffective-assistance claims, a petitioner must have raised the precise attorney error to the state courts before that claim can be heard on habeas review. *See Landrum v. Mitchell*, 625 F.3d 905, 918-19 (6th Cir. 2010) (holding petitioner procedurally defaulted claim that trial counsel was ineffective for not introducing helpful testimony because petitioner did not allege that error in his state post-conviction petition.).

Before the Sixth District, Mr. Hopings raised the errors now alleged in Ground One. (*Compare* ECF #11 at PageID 53-63 *with* ECF #16-1 at PageID 1030-40). But when Mr. Hopings appealed to the Supreme Court of Ohio, he raised just eight of the errors—that his trial counsel failed to:

1. Request a bill of particulars,

2. Cite any case law or effectively argue the motion to dismiss,

3. Move to dismiss based on a violation of his speedy-trial rights,

4. Raise a *Batson* challenge to the State striking an African-American juror,

5. Challenge the juror who asked the prosecutor whether Mr. Hopings had "taken a plea so we can all go home" and examine whether the remaining jurors potentially heard the remark,

6.      Challenge the testimony of the social worker,

7.      Call witnesses who would have testified that L.S.'s allegations could not have happened, and

8.      Interview L.S.

(*See* ECF #16-1 at PageID 1150-51) (cleaned up).[2] Because the other errors were not raised before the Supreme Court of Ohio, they are procedurally defaulted and cannot be heard on habeas review. Thus, habeas review of the merits of Ground One is limited to whether Mr. Hopings's trial counsel was ineffective by these eight failings. I conclude all other errors raised in Ground One are procedurally defaulted.

Mr. Hopings does not advance cause for why he did not raise some of his errors before the Supreme Court of Ohio. Rather, he argues the State is "nitpicking the specific language on the ineffective counsel claim" and such nitpicking "is, in actuality irrelevant." (ECF #24 at PageID 1387). But this does not serve as cause to excuse his failure to raise the attorney errors he raises in his habeas petition. *See Landrum*, 625 F.3d at 918-19.

Mr. Hopings also asserts that a manifest miscarriage of justice will occur if the procedural default is not overlooked because he is actually innocent. (ECF #24 at PageID 1388). Actual innocence means "factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623. As a result, Mr. Hopings must support his actual innocence claim with new reliable evidence (such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence) that was not presented at his trial and is so strong a court cannot have confidence in the outcome of his

---

[2]     Mr. Hopings alleged in his jurisdictional memorandum that his trial counsel was ineffective for not seeking dismissal of the indictment as duplicative or researching, investigating, and preparing for trial. (ECF #16-1 at PageID 1150). These allegations do not appear in his amended habeas petition and accordingly I do not address them.

trial. *See Schlup*, 513 U.S. at 324. While Mr. Hopings maintains he is innocent, he does not present any new evidence that was not presented at trial supporting that assertion. (*See* ECF #24 at PageID 1388). Rather, he relies on his appellate claims that the evidence against him was not credible and improperly admitted. (*See id.*).

These arguments attacking the State's case do not meet the actual-innocence exception to procedural default because they do not show Mr. Hopings affirmatively did not commit the offenses charged. *See Hubbard v. Rewerts*, 98 F.4th 736, 747 (6th Cir. 2024) (holding the exception requires "[a] petitioner[] . . . to make a gateway showing that he didn't do the crime (which goes to actual innocence) instead of merely attacking the state's case (which could show legal innocence)"). Even if Mr. Hopings offered new evidence completely impeaching the credibility of the witnesses against him, that would still be insufficient because the actual-innocence exception requires exoneration. *See Hubbard*, 98 F.4th at 749 ("Even if we discredit Collins's testimony from Hubbard's trial, Hubbard is left with only the lack of an incriminating witness, not the presence of an exonerating one."). Additionally, to excuse the default, Mr. Hopings cannot rely on the letter from the victim recanting her allegations because the letter was presented at trial (*see* ECF #15-2 at PageID 767-71, 781, 788-98, 818-21, 824-26) and the exception requires new evidence not presented at trial. *See Schlup*, 513 U.S. at 324. Thus, Mr. Hopings has not made the required showing to overlook the procedural default of some of his claims for ineffective assistance of trial counsel.

I thus recommend the District Court **DISMISS** the portion of Ground One not raised before the Supreme Court of Ohio as procedurally defaulted.

**B.** **Ground Four is procedurally defaulted under Ohio's contemporaneous-objection rule.**

In Ground Four, Mr. Hopings argues his convictions for rape and sexual battery are allied offenses of similar import and the jury did not find the separate nature of those offenses. (ECF #11 at PageID 74). The State counters that Mr. Hopings procedurally defaulted Ground Four because he did raise this argument at the sentencing hearing. (ECF #15 at PageID 109-10).

A petitioner can procedurally default a claim if a petitioner "fails to comply with state procedural rules in presenting his claim to the appropriate state court." *Williams*, 460 F.3d at 806. There is a four-pronged analysis to determine whether a state procedural rule bars review of his habeas claims: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner disregarded that rule; (2) whether the state court enforced the procedural rule; (3) whether the procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can show cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *Maupin*, 785 F.2d at 138.

For the first prong, Ohio has a contemporaneous-objection rule prohibiting the later review of a claim when no objection was made during trial proceedings absent a showing of cause and prejudice. *State v. Murphy*, 747 N.E.2d 765, 788-89 (Ohio 2001). Mr. Hopings did not follow this rule because he did not object to the possible confusion about whether the jury had to find he committed six separate crimes or to the trial court's imposition of multiple sentences rather than merging the convictions. The Sixth District noted this fact in its decision. (*See* ECF #16-1 at PageID 1141; *see also Hopings*, 2022 WL 1439828, at *13). Thus, there is an applicable Ohio procedural rule that Mr. Hopings did not follow.

For the second prong, Ohio courts enforce the contemporaneous-objection rule by analyzing a waived error under a plain-error standard of review. *See Murphy*, 747 N.E.2d at 789 (quoting Ohio Crim. R. 52(B)). The Sixth District did exactly that. (*See* ECF #16-1 at PageID 1141). Importantly, the Sixth Circuit has held an Ohio court conducting plain-error review on waived errors does not mean the state courts did not enforce the procedural rule. *See Lundgren* 440 F.3d at 765. Thus, the Ohio courts enforced the procedural rule.

For the third prong, the Sixth Circuit has repeatedly held Ohio's contemporaneous-objection rule is an independent and adequate state ground to foreclose review. *See Hand v. Houk*, 871 F.3d 390, 417 (6th Cir. 2017). Courts have applied the rule in habeas proceeding to allied-offenses claims that were not objected to during sentencing. *See Saxton v. Warden*, No. 2:21-CV-4019, 2022 WL 1173891, at *8 (S.D. Ohio Apr. 20, 2022), *report and recommendation adopted*, 2022 WL 3339486 (S.D. Ohio Aug. 12, 2022).

For the fourth prong, Mr. Hopings argues he had cause for the procedural default because his trial counsel was ineffective for failing to object. (ECF #24 at PageID 1388). While ineffective-assistance-of-counsel claims can serve as cause to excuse a procedural default, such claims must themselves not be procedurally defaulted. *Murray*, 477 U.S. at 488-89. Mr. Hopings procedurally defaulted a claim that his trial counsel was ineffective for not objecting at sentencing because he did not include that argument in his direct appeal despite raising many other errors. (*See* ECF #16-1 at PageID 1030-40). Mr. Hopings cannot argue his appellate counsel was also ineffective for not arguing this particular attorney error because Mr. Hopings procedurally defaulted that argument by not including it in his application to reopen his direct appeal. (*See id.* at

PageID 1215-24). Thus, Mr. Hopings does not establish cause for why he did not follow the state procedural rule.

All four prongs support finding Mr. Hopings procedurally defaulted Ground Four. As discussed above, Mr. Hopings has not made the required showing for the actual-innocence exception to procedural default. I therefore recommend the District Court **DISMISS** Ground Four as procedurally defaulted.

## II.    Merits of the remaining grounds for relief

### A.    Grounds One and Two: the remaining claims of ineffective assistance of trial counsel

In the surviving portion of Ground One, Mr. Hopings argues his trial counsel was ineffective for several reasons. (*See* ECF #11 at PageID 54-63). These include that trial counsel did not:

1.    Request a bill of particulars,

2.    Cite any case law or effectively argue the motion to dismiss,

3.    Move to dismiss based on a violation of his speedy-trial rights,

4.    Raise a *Batson* challenge to the State striking an African-American juror,

5.    Challenge the juror who asked the prosecutor whether Mr. Hopings had "taken a plea so we can all go home" and examine whether the remaining jurors potentially heard the remark,[3]

6.    Challenge the testimony of the social worker,

7.    Call witnesses who would have testified that L.S.'s allegations could not have happened, and

8.    Interview L.S.

---

[3]    Mr. Hopings re-argues the fifth error as Ground Two. (ECF #11 at PageID 63-68). Because the standard of review and governing law is the same for Grounds One and Two, I address both ineffective-assistance claims together.

On habeas review, this Court reviews the last-explained state-court judgment on the issue. *See Ylst*, 501 U.S. at 805. Because the Supreme Court of Ohio declined jurisdiction, the last-explained state-court judgment on Mr. Hopings's ineffective-assistance claims was the Sixth District's determination on direct appeal.

Because the Sixth District determined the merits of those claims (*see* ECF #16-1 at PageID 1126-33), its decision is subject to AEDPA deference. *See Smith v. Warden, Toledo Corr. Inst.*, 780 F.App'x 208, 225 (6th Cir. 2019). It bears repeating that AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell*, 543 U.S. at 455 (cleaned up). Under AEDPA deference, Mr. Hopings must demonstrate the Sixth District's adjudication of his ineffective-assistance claims "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." *See* 28 U.S.C. § 2254(d).

For a habeas petitioner to establish that counsel's representation was constitutionally deficient, the petitioner must show (1) counsel's representation fell below an objective standard of reasonableness based on all the circumstances in the case, such that the attorney did not function as "counsel" guaranteed by the Sixth Amendment, and (2) counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To satisfy the deficiency prong, the habeas petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 668. Because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a

29

court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable," a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. This is an extremely deferential standard, because "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. To satisfy the prejudice requirement of *Strickland*, the habeas petitioner must show "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome." *Id.* at 694. Failure to satisfy either requirement dooms an ineffective-assistance-of-counsel claim. *Id.* at 697. And although the habeas petitioner must prove each element of the two-part *Strickland* test to show ineffective assistance of counsel, courts need not conduct an analysis under both prongs. *Id.* at 697.

### 1. Failure to demand a bill of particulars

First, Mr. Hopings argues his counsel was ineffective for not demanding a bill of particulars. On this issue, the Sixth District concluded:

> {¶47} Appellant states that "determining how a Bill of Particulars was not requested is impossible to explain, but for counsel's ineffectiveness." Appellant's conclusory argument, however, is insufficient to show that he suffered prejudice as a result of trial counsel's conduct. Appellant offers no argument about how having the information contained in a detailed bill of particulars would have impacted his defense. As noted by the state, appellant's defense was to challenge L.S.'s credibility—that is, to create a reasonable doubt as to whether the charged conduct ever occurred. A bill of particulars providing specific dates, times, and locations at which the conduct occurred is irrelevant to that defense. It is unclear, then, how any additional information contained in a bill of particulars would allow appellant to show a reasonable probability that the proceeding's results would have been different.

(*Id.* at PageID 1129).

The Sixth District did not unreasonably apply *Strickland*'s prejudice prong by requiring Mr. Hopings to prove this error would have led to a different result at trial. In his Traverse, Mr. Hopings cites *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986), for the proposition that counsel's failure to timely seek suppression or conduct discovery could not be explained as a strategic choice but was a deficient performance. (*See* ECF #24 at PageID 1391). While this goes to the deficiency prong of *Strickland*, it does not explain how Mr. Hopings's trial would have reached a different outcome had his attorney sought a bill of particulars. Although a bill of particulars might have narrowed the timeframes for the offenses, it is uncertain how that would aid Mr. Hopings's trial strategy to completely impeach L.S.'s credibility. Thus, the Sixth District's reasoning was not "so lacking in justification" to warrant reversal, *Harrington*, 562 U.S. at 103, because *Strickland* disapproves of speculative arguments. *See Strickland*, 466 U.S. at 697.

### 2. Failure to effectively argue the motion to dismiss

Second, Mr. Hopings argues his trial counsel was ineffective for not effectively arguing the motion to dismiss based on L.S.'s 2017 letter recanting her allegations. (ECF #11 at PageID 54-55). On this issue, the Sixth District concluded:

> {¶45} Appellant first argues that trial counsel's "simplistic" motion to dismiss supports his claim that trial counsel was ineffective. The motion to dismiss consisted of a single paragraph which argued that L.S.'s 2017 letter recanting her allegations showed that appellant had been "exonerated" and should have resulted in dismissal of all charges. Appellant identifies trial counsel's failure to include any additional information, or citation to any case authority which would have otherwise supported the motion, as an example of his deficient representation. Appellant fails, however, to identify any prejudice he suffered as a result of the allegedly deficient motion.

> {¶46} A Crim.R. 12(C) motion to dismiss can only raise matters that are capable of determination without a trial on the general issue. The trial court denied appellant's motion recognizing that whether L.S.'s letter precluded the state from proving all elements of the indicted offenses could only be determined at trial. In his brief, appellant simply argues that the motion was deficient. He does not, however, provide any basis on which a properly supported motion would have resulted in the dismissal

of the charges. Because appellant does not identify the information trial counsel omitted from its "minimalist" motion that would have warranted dismissal of the charges, he fails to show that the results would have been different and that he suffered prejudice as a result. Therefore, trial counsel's conduct in filing the motion to dismiss does not support a claim for ineffective assistance of counsel.

(ECF #16-1 at PageID 1128) (internal citations omitted).

The Sixth District did not unreasonably apply *Strickland*. This Court is bound by the Sixth District's determination that Ohio Criminal Rule 12(C) does not allow for dismissal when the defendants asserts the State will be unable at trial to prove beyond a reasonable doubt all the elements of the indicted offenses. *See Bradshaw*, 546 U.S. at 76. Consequently, Mr. Hopings could not have been prejudiced by the motion because, under the Sixth District's interpretation, his motion was improper and never would have succeeded.

### 3. Failure to seek dismissal for a violation of the right to a speedy trial

Third, Mr. Hopings argues his trial counsel was ineffective for not seeking dismissal based on a violation of his speedy-trial rights. (ECF #11 at PageID 56). The Sixth District did not address directly whether Mr. Hopings's counsel was ineffective for not raising his speedy-trial rights. Even so, when a state court denies relief on a properly presented federal claim, a federal habeas court can presume that the state court adjudicated that claim on the merits. *Harrington*, 562 U.S. at 99.

Here, the Sixth District denied Mr. Hopings's ineffective-assistance claims (ECF #16-1 at PageID 1126-33) and separately determined Mr. Hopings's state speedy-trial rights were not violated (*id.* at PageID 1133-39). From those two holdings, this Court can presume under *Harrington* that the Sixth District would have denied this claim because Mr. Hopings's counsel was not ineffective for not arguing a meritless issue. *See Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013) ("Omitting meritless arguments is neither professionally unreasonable nor prejudicial."). Moreover, as will be explained further in Ground Three, Mr. Hopings's federal speedy-trial claim is

meritless so the Sixth District probably would not have decided differently had his counsel raised a federal constitutional claim.

      4.      **Failure to not raise a *Batson* challenge to the State striking an African-American juror**

Fourth, Mr. Hopings claims his trial counsel was ineffective for not objecting under *Batson v. Kentucky*, 476 U.S. 79 (1986), to the State's peremptory challenge of Juror #7. (*See* ECF #11 at PageID 56). He raised the error before the Sixth District alongside other errors during jury selection. (ECF #16-1 at PageID 1033). The Sixth District addressed those errors as a group, concluding:

> {¶ 48} Appellant argues that trial counsel's failure to object to the dismissal for cause of a disabled member of the venire, and the failure to question other jurors that may have overheard Juror Number 12's remark regarding a plea agreement, resulted in ineffective representation. Again, appellant merely argues that trial counsel should have made a more significant inquiry of certain members of the venire during voir dire. He makes no argument showing what questions counsel could have asked that would have either shown the disabled juror should not have been dismissed or that the jurors who may have heard Juror Number 12's remark would have exhibited bias toward him. Therefore, appellant has not shown that the proceeding's results would have been different had his counsel conducted a more comprehensive voir dire. The lack of identified prejudice resulting from trial counsel's decision precludes a finding of ineffective assistance of counsel based on counsel's allegedly deficient performance during jury selection.

(ECF #16-1 at PageID 1130).

This is not an unreasonable application of the *Strickland* standard to the facts of Mr. Hopings's case. The transcript of voir dire reveals the State tried, and failed, to strike Juror #7 for cause because the juror attended the same church as Mr. Hopings's counsel. (*See* ECF #15-2 at PageID 645-46). This occurred right before the peremptory strike. (*Id.* at PageID 647). Thus, there is no sign the trial court would have sustained a *Batson* challenge had one been raised because the State already articulated a race-neutral explanation for the challenge. *See Batson*, 476 U.S. at 97-98

(prosecutor must provide a race-neutral explanation for a peremptory strike in response to a properly supported *Batson* challenge).

> **5.** **Failure to challenge the juror who asked the prosecutor whether Mr. Hopings had "taken a plea so we can all go home" and examine whether the remaining jurors potentially heard the remark (Ground Two)**

Fifth (and separately in Ground Two), Mr. Hopings argues his trial counsel was ineffective for not examining for potential bias a juror who asked the prosecutor whether Mr. Hopings had "taken a plea so we can all go home" or investigating whether other jurors were prejudiced by that statement. (ECF #11 at PageID 57, 63-68; ECF #24 at PageID 1391, 1395-96). On this issue, the Sixth District found:

> {¶37} In his second assignment of error, appellant argues that his trial counsel's consent to Juror Number 12's continued service on the jury despite her alleged bias against him constituted ineffective assistance of counsel. In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court proceedings cannot be relied on as having produced a just result. An appellant must show (1) deficient performance of counsel, *i.e.*, performance falling below an objective standard of reasonable representation, and (2) prejudice, *i.e.*, a reasonable probability that, but for counsel's errors, the proceeding's result would have been different. Appellant does not meet this burden as to his second assignment of error.
>
> {¶38} Appellant argues that a singular decision made by trial counsel—that is, the failure to object to Juror Number 12's service on the jury—rendered his counsel's assistance ineffective. Essentially, appellant argues that because Juror Number 12 had commented that a plea deal would have allowed her and the rest of the jury to "go home" that she was biased against appellant. Appellant argues that he suffered prejudice as a result of trial counsel's failure to investigate that bias or ask for her removal from the jury. We disagree.
>
> {¶39} Generally, the determination as to whether to challenge a juror is a matter of trial strategy which Ohio courts have consistently declined to second guess or impose 'hindsight views about how current counsel might have voir dired the jury differently. Few decisions at trial are as subjective or prone to individual attorney strategy as juror voir dire, where decisions are often made on the basis of intangible factors. Counsel is in the best position to determine whether any potential juror should be questioned and to what extent.

{¶40} Our review of the record, including Juror Number 12's responses during the initial voir dire and her responses to questions in chambers, reveals no evidence that appellant's trial counsel's desire to keep her on the jury fell below an objective standard of reasonable representation. Juror Number 12 stated that she could be fair and reasonable despite her statement to the prosecutor. Appellant's counsel, who was in the best position to determine whether Juror Number 12's service on the jury would benefit appellant, explicitly stated that he had considered all of Juror Number 12's responses during voir dire in determining that she could remain fair and impartial despite her allegedly biased remark. We find nothing in the record to suggest that trial counsel's decision was anything more than trial strategy. Therefore, appellant has not established that his counsel's performance was deficient.

{¶41} Appellant likewise fails to show that Juror Number 12's service on the jury resulted in prejudice. When a defendant bases an ineffective assistance claim on an assertion that his counsel allowed the impanelment [*sic*] of a biased juror, the defendant must show that the juror was actually biased against them. Actual bias is bias in fact—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality. Impartiality may be shown through the juror's own statements.

{¶42} Although appellant argues that Juror Number 12 was biased against him, the record does not support that claim. A fair reading of Juror Number 12's remark indicates that she sought to avoid jury service generally, not that she had prejudged appellant's guilt. During the in-chambers voir dire, the trial court noted that during general voir dire, only one potential juror—not Juror Number 12—raised their hand when asked if they were excited to have received the jury summons. While recognizing that it was not always convenient, the trial court impressed upon Juror Number 12 the importance of jury service. Juror Number 12 responded that she understood her responsibility and that her remark regarding ending that service early did not impact her ability to judge appellant's guilt or innocence based on the evidence presented. Based on Juror Number 12's own statements, we find that there is nothing in the record to suggest that Juror Number 12 was biased against appellant or that he suffered any prejudice as a result of her participation on the jury. As a result, we find appellant's second assignment of error not well-taken.

(ECF #16-1 at PageID 1123-26) (citations and quotation marks omitted).

The Sixth District's determination was not an unreasonable application of the *Strickland* standard. Counsel enjoys particular deference when conducting voir dire and an attorney's actions during voir dire are considered matters of trial strategy. *See Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001). A strategic decision cannot be the basis for a claim of ineffective assistance

unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious

unfairness. *Id.* To support a claim that a biased juror prejudiced him, Mr. Hopings must show the

juror was actually biased against him. *Hughes*, 258 F.3d at 458. And the Supreme Court has held:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd*, 366 U.S. 717, 723 (1961) (citations omitted). Even still, "the juror's assurances that

he is equal to this task cannot be dispositive of the accused's rights." *Murphy v. Florida*, 421 U.S.

794, 803 (1975). Thus, it falls to the defendant "to demonstrate the actual existence of such an

opinion in the mind of the juror as will raise the presumption of partiality." *Id.* (quotation

omitted). In applying this standard, the Supreme Court has upheld the empaneling of jurors who,

during voir dire, expressed doubts, or even disclaimed outright, their ability to be impartial. *See*

*Patton v. Yount*, 467 U.S. 1025, 1032 (1984); *Murphy*, 421 U.S. at 803.

A review of the transcript shows during the break between the end of voir dire and the

beginning of trial (when the jury would receive their first instructions), Juror #12 asked the

prosecutor whether Mr. Hopings "had taken a plea so we can all go home?" (ECF #15-2 at

PageID 658-59). The jury had not yet been given instructions, including the instruction not to talk

to the attorneys. (*See id.* at PageID 664, 667-75). The trial judge questioned the juror in chambers

with counsel present and the juror volunteered she had intended the comment as a joke. (*Id.* at

PageID 663). The judge asked the juror if she "still believe[d] that [she] could sit and listen to the

evidence" and she replied "[o]h, yes." (*Id.*).

These assurances support the finding that the juror was not actually biased. *See Hughes*, 258 F.3d at 456 (finding actual bias where venire member admitted, "I don't think I could be fair" with no later assurance of impartiality). So it was not an unreasonable determination of the facts for the Sixth District to conclude "A fair reading of [J]uror [N]umber 12's remark indicates that she sought to avoid jury service generally, not that she had prejudged appellant's guilt." (ECF #16-1 at PageID 1126)

While Mr. Hopings argues that the juror's statements were "self-serving" and "obviously and blatantly contradicted by the evidence" (ECF #24 at PageID 1396), he does not explain how. Even if not intended as a joke, questioning whether Mr. Hopings had entered a plea agreement is different from endorsing Mr. Hopings's guilt or encouraging him to plead guilty. Nor does he explain how the juror's comment and his attorney's decision not to move to strike the juror for cause was "so ill-chosen that it permeated the entire trial with obvious unfairness." *See Hughes*, 258 F.3d at 457.

### 6.    Failure to impeach the social worker with her records

Sixth, Mr. Hopings argues his trial counsel was ineffective in cross-examining Kaitlin Middleton, the social worker who interviewed L.S. (ECF #11 at PageID 58). In addressing this issue, the Sixth District found:

> {¶49} Appellant next challenges trial counsel's failure to properly cross-examine Kaitlin Middleton and Detective Taulton. Specifically, he argues that trial counsel should have obtained Middleton's discoverable records of her interactions with L.S. and used them to prepare for her cross-examination. Appellant concludes that "[g]iven the list of other items that the defense counsel missed, ignored, or glossed over, in evaluating his constitutional effectiveness, this should be considered." Appellant offers no argument, however, as to what these records would have revealed or how they could have been utilized at trial to procure a different result.

(ECF #16-1 at PageID 1130-31).

This was not an unreasonable application of *Strickland* to conclude Mr. Hopings was not prejudiced by his counsel's failure to impeach Ms. Middleton with her records. While Mr. Hopings argues he was deprived of the opportunity to impeach her as a witness and "obliterate[] the state's case" (ECF #24 at PageID 1392-93), he presupposes the existence of material to impeach her with. At no point has Mr. Hopings identified the "records" his trial counsel should have secured—whether her personnel file, notes on L.S., or otherwise. Nor has he identified material within those unidentified "records" that would impact Ms. Middleton's credibility as a witness. Speculative arguments about how evidence might exist that might impact a witness's credibility are the kind of second-guessing that *Strickland* disfavors and thus are not enough to establish his trial counsel was ineffective. *See Strickland*, 466 U.S. at 689.

### 7.     Failure to call more defense witnesses

Seventh, Mr. Hopings argues his trial counsel was ineffective for not calling more defense witnesses. (ECF #11 at PageID 60; ECF #24 at PageID 1393). In deciding this error, the Sixth District found:

> As to his own defense, appellant argues that trial counsel made "minimal effort" to investigate and present additional witnesses which might have provided a more substantive defense to the charges against him. Appellant makes absolutely no mention of who else trial counsel might have called to testify in his defense or the subject matter of their testimony. Without this information, appellant can only make conclusory statements that his trial counsel was ineffective. These statements are insufficient to show that appellant suffered prejudice as a result of this alleged error.

(ECF #16-1 at PageID 1131-32).

This was not an unreasonable application of *Strickland* to the facts of Mr. Hopings's case. While Mr. Hopings argues in his Traverse that the failure to call witnesses is necessarily deficient performance (ECF #24 at PageID 1393), he does not identify the witnesses that should have been called or how their testimony would have led to a different outcome. A review of the trial

transcripts shows two witnesses were not called. (ECF #15-2 at PageID 890). But the transcript indicates their testimony would be of limited value: one witness was merely cumulative to the two witnesses who were called and the other would "testify to in comparison to some of the blemishes out there in terms of prior convictions." (*Id.*) [*sic*]. But without a sign of how the two uncalled witnesses or others would have aided his defense, the Sixth District's decision was not unreasonable. *See Fitchett v. Perry*, 644 F.App'x 485, 493 (6th Cir. 2016) (rejecting ineffective-assistance claim because habeas petitioner did not identify any witness who can corroborate his self-defense account).

### 8.    Failure to interview the victim

Last, under the heading of "failures which, in the aggregate, demonstrate ineffectiveness," Mr. Hopings argues a bulleted list of complaints and the sole claim surviving procedural default is that his trial counsel was ineffective for not interviewing the victim. (*See* ECF #11 at PageID 60). He raised this error in a bulleted list before the Sixth District as well (*see* ECF #16-1 at PageID 1037) and the Sixth District addressed all the errors in the list together:

> {¶53} We note that in addition to the 5 enumerated alleged instances described above, appellant also identifies a list of 33 incidents which occurred before or during his trial which he requests this court consider in resolving his first assignment of error. The list includes, among other items, actions taken by appellant himself ("Appellant has no confidence in counsel and explains that to the Court," "Appellant requests new counsel"), actions taken by the trial court ("Jury sworn in AFTER the issue with juror [number 12]," "Trial Judge states concern for Defendant's Speedy Trial rights"), assumptions regarding trial counsel's motives for certain decisions ("Counsel fails to ask prospective juror questions because she is disabled," "Counsel 'stipulates' to the evidence, without any indication that he has ever reviewed it"), and the identification of 14 off-the-record conversations which occurred throughout trial. Essentially, appellant has provided a list of grievances he had with the entire trial process in order to bolster his "cumulative" error argument.

> {¶54} We find no bases on which appellant's own conduct or actions taken by the trial court could be imputed to trial counsel in support of a claim for ineffective assistance. Moreover, there is nothing in the brief, or in the record, which correlates

the listed conduct attributable to trial counsel with whether trial counsel's assistance fell below an objective standard of reasonable representation or resulted in prejudice. Appellant merely states that this list reflects a general "substandard effort by trial counsel." General averments that the prejudice suffered is "clear" and "obvious" cannot "act as a substitute for an actual showing of prejudice." As a result, we find that appellant fails to show that any of these miscellaneous allegations satisfy either element of his claim for ineffective assistance of counsel.

{¶55} In sum, appellant fails to show that any of his individual claims of ineffective assistance of counsel have merit. Since cumulative error cannot be established simply by joining meritless claims together, appellant has failed to establish [that] he received ineffective assistance of trial counsel.

(ECF #16-1 at PageID 1132-33) (citations omitted).

This was not an unreasonable application of *Strickland* to conclude that Mr. Hopings's miscellaneous errors did not amount to deficient performance. Even if trial counsel was deficient in not interviewing L.S., Mr. Hopings does not present any new facts that would have been discovered that could have been used to impeach the victim during cross-examination. *See Brown v. Sheets*, 359 F.App'x 628, 631 (6th Cir. 2009) (rejecting ineffective-assistance claim because habeas petitioner had only speculative arguments about what new facts would be found by interviewing rape victim). Thus, the Sixth District's determination was not unreasonable.

Because the Sixth District's rejection of Mr. Hopings's eight ineffective-assistance claims was not an unreasonable application of federal law or based on an unreasonable determination of the facts, I recommend the District Court **DENY** the remaining portions of Ground One and all of Ground Two as meritless.

## B. Ground Three: the Sixth Amendment right to a speedy-trial

In his third ground for relief, Mr. Hopings argues the State violated his speedy-trial rights because he spent more time in pretrial detention than the 270-day maximum Ohio law allows. (ECF #11 at PageID 68-74). The State responds that Mr. Hopings advances a non-cognizable state

statutory claim, not a federal constitutional claim. (ECF #15 at PageID 129-30). The State further argues even were he to argue a federal constitutional claim, it would be meritless. (*Id.* at PageID 134-35). I conclude that Mr. Hopings does present a federal constitutional claim, but that claim is meritless.[4]

### 1.    Ground Three presents a cognizable federal constitutional claim

The State contests Mr. Hopings has not made out a federal constitutional claim in Ground Three, but has presented a violation of Ohio state statutes, making Ground Three not cognizable in habeas review. (ECF #15 at PageID 129). The District Court lacks jurisdiction over a petitioner's claims for purposes of habeas corpus review if the claims do not "challenge the legality of his custody" based on a "violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a); *see also Rivera*, 556 U.S. at 158 ("The Due Process Clause . . . safeguards not the meticulous observance of state procedural prescriptions, but the fundamental elements of fairness in a criminal trial.") (quotation omitted). A petitioner need not cite "chapter and verse" of constitutional law to make out a federal constitutional claim. *Franklin v. Rose*, 811 F.2d 322, 326

---

[4]    To the extent that Mr. Hopings seeks habeas relief for a violation of the speedy-trial protections under Ohio state law, such a claim is not cognizable. *See Hopkins v. Banks*, No. 1:09-CV-0387, 2010 WL 5644827, at *4 (N.D. Ohio Dec. 14, 2010) ("When a petitioner in a federal habeas corpus proceeding asserts the denial of his right to a speedy trial as a violation of state law, the claim is not cognizable."). This Court would also be bound by the Sixth District's decision concluding that Mr. Hopings's statutory speedy-trial rights were not violated. *See Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998) ("It is especially inappropriate for a federal habeas court to set aside a state court's ruling on an issue of state law where, as in the present situation, Ohio's appellate courts on direct appeal have already found appellant's claim of a violation of his statutory right to a speedy trial to be meritless."). Additionally, to the extent that Mr. Hopings recasts a state-law speedy-trial claim as a violation of federal guarantees of procedural due process, such a claim also would not entitle him to habeas relief. *See Engle*, 456 U.S. at 121 n.21 ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted). Thus, to the extent that Mr. Hopings makes such claims, I recommend the District Court deny such claims as not cognizable.

(6th Cir. 1987). But "general allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present claims' that specific constitutional rights were violated." *McMeans*, 228 F.3d at 681. Moreover, merely asserting that a state-law error violates the federal constitution cannot by itself justify jurisdiction. *See Wilson*, 562 U.S. at 5.

Courts use a four-prong analysis to determine whether a petitioner has fairly presented a federal constitutional claim: (1) whether the petitioner phrased the federal claim in terms of the pertinent constitutional law or in terms sufficiently particular to allege a denial of the specific constitutional right in question; (2) whether the petitioner relied on federal cases employing the constitutional analysis in question; (3) whether the petitioner relied on state cases employing the federal constitutional analysis in question; or (4) whether the petitioner alleged facts well within the mainstream of the pertinent constitutional law. *See Hicks*, 377 F.3d at 553.

For the first prong, Mr. Hopings says in Ground Three that he "is entitled to have this case dismissed and be released due to the violation of his speedy trial rights, pursuant to the United States and Ohio constitutions." (ECF #11 at PageID 68). He later recasts this as a violation of his "rights to a fair and reliable trial as mandated by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution as well as the relevant provisions of the Ohio Constitution." (ECF #11 at PageID 74). In his Traverse, Mr. Hopings also casts his statutory speedy-trial claim as a violation of federal procedural due process. (*See* ECF #24 at PageID 1398).

Mr. Hopings's argument in his amended petition is devoted to Ohio's statutory 270-day requirement to initiate a trial, the statute's framework for triple counting the days spent in pretrial detention, and whether the statutory clock resets when an indictment is dismissed without prejudice and refiled. (ECF #11 at PageID 68-74). His Traverse also discusses the state statutory

framework. (ECF #24 at PageID 1397). While the Traverse does cite the applicable federal multi-factor balancing test, Mr. Hopings discusses each factor in single sentences.

For the second prong, Mr. Hopings does not cite to any federal cases when arguing Ground Three in his amended petition. (*See* ECF #11 at PageID 68-74). Instead, he repeats his argument before the Sixth District and cites exclusively Ohio cases and argues Ohio's speedy-trial statute, Revised Code § 2945.71. (*Compare id. with* ECF #16-1 at PageID 1045-51). In his Traverse, Mr. Hopings does cite two federal cases, *Barker v. Wingo*, 407 U.S. 514 (1972), and *Sandin v. Connor*, 515 U.S. 472 (1995), which both employ the federal speedy-trial and procedural due-process analyses, which he asserted in his amended petition. (ECF #24 at PageID 1398).

For the third prong, four of the thirteen Ohio cases Mr. Hopings cites in his amended petition incorporate federal analysis at least in some way. *See Brecksville v. Cook*, 661 N.E.2d 706, 709 (Ohio 1996) (citing *Barker*, 407 U.S. 514, in passing but analyzing constitutionality of Ohio's speedy-trial statutes under Ohio law); *State v. Taylor*, 781 N.E.2d 72, 79 (Ohio 2002) (applying *Barker*, 407 U.S. 514, and *Doggett v. United States*, 505 U.S. 647 (1992), in the alternative); *State v. Butler*, 249 N.E.2d 818, 820 (Ohio 1969) (citing *Kloper v. North Carolina*, 386 U.S. 213 (1967)); *State v. Jackson*, No. 02-AP-468, 2003 WL 1701188, at *5-6 (Ohio Ct. App. Mar. 31, 2003) (citing *Barker*, 407 U.S. 514 in the alternative). But none of the cases rely primarily on a federal analysis.

The other nine Ohio cases Mr. Hopings cites in his amended petition do not employ a federal speedy-trial analysis at all, but exclusively address Ohio's speedy-trial requirement. *See State v. Blackburn*, 887 N.E.2d 319 (Ohio 2008) (analyzing only Ohio law); *State v. Taylor*, No. 16-CA-17, 2016 WL 5118653, at *4-6 (Ohio Ct. App. Sept. 21, 2016) (same); *State v. Dillon*, No. 05AP-679, 2006 WL 1781406, at *7-8 (Ohio Ct. App. June 29, 2006) (citing federal law only for ineffective-

assistance standard but applying Ohio law to assess whether Ohio's speedy trial requirement was violated and whether counsel was, in turn, ineffective for not seeking dismissal on that ground); *State v. Parker*, 863 N.E.2d 1032, 1035-36 (Ohio 2007) (analyzing only Ohio law); *State v. Parsley*, 612 N.E.2d 813, 814-15 (Ohio Ct. App. 1993) (same); *State v. Baker*, 676 N.E.2d 883 (Ohio 1997) (mentioning federal speedy-trial guarantee in passing, but analyzing only Ohio law); *State v. Miller*, No. 06AP-36, 2006 WL 2733241, at *3-4 (Ohio Ct. App. Sept. 26, 2006) (same); *State v. Butcher*, 500 N.E.2d 1368 (Ohio 1986) (analyzing only Ohio law); *State v. DePue*, 645 N.E.2d 745, 747-48 (Ohio Ct. App. 1994) (same).

For the fourth prong, the facts that support a speedy-trial violation under Ohio law (the date of indictment, length of time spent in pretrial detention, continuances by the State and the defendant, assertion of the right, and dismissal and refiling of the indictment) are "well within the mainstream" of the Sixth Amendment's speedy-trial guarantee. Ohio courts have (with some caveats) interpreted Ohio's statutory and constitutional speedy-trial provisions as like the federal constitutional speedy-trial provision. *See State v. Selvage*, 687 N.E.2d 433, 435 (Ohio 1997) ("[t]he Ohio Constitution provides similar protection" to the Sixth Amendment); *see also Butler*, 249 N.E.2d at 820 (holding Ohio's constitutional speedy-trial rights are not broader than federal analogue and then not addressing Ohio speedy-trial claim separately after resolving the federal claim). Thus, by presenting the factual predicate of an Ohio speedy-trial claim, Mr. Hopings also presented the factual predicate that would underly a federal claim.

In sum, an Ohio speedy-trial claim and a federal one are very similar: the Sixth Circuit has held that Ohio's statutory procedure "is not 'substantially different' from the *Barker* analysis, and can be seen as merely the state's method of applying that Supreme Court precedent in a more

structured manner." *Brown v. Bobby*, 656 F.3d 325, 330 (6th Cir. 2011). Thus, while most of Mr. Hopings's argument and supporting case law support only a state statutory claim, Mr. Hopings has mentioned the Sixth Amendment, cited cases that apply the federal standard, discussed the federal standard in his Traverse (although briefly), and presented facts well within the mainstream of a Sixth Amendment violation. It is also well-settled that courts construe pro se habeas petitions liberally. *See Franklin v. Rose*, 765 F.2d 82, 84-85 (6th Cir. 1985). Taking the similarity of the state claim Mr. Hopings does present and the cognizable federal claim together with the liberal construction afforded to a pro se petition, I conclude Mr. Hopings has made out a federal constitutional claim in Ground Three.

### 2.    Mr. Hopings's federal speedy-trial right was not violated.

Before addressing the merits of Mr. Hopings's federal speedy-trial claim, I must determine the standard of review. The Sixth District did not rule on the merits of that claim, concluding Mr. Hopings had only made out an Ohio statutory claim. (ECF #16-1 at PageID 1134, n.3). The State concedes that Mr. Hopings presented Ground Three to the state courts. (ECF #15 at PageID 109).

When a state court denies relief on a properly presented federal claim, a federal habeas court can presume the state court decided that claim on the merits when there is no indication or state-law procedural principle to the contrary. *Harrington*, 562 U.S. at 99. The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely. *Id.* at 99-100. But the Supreme Court has cautioned that petitioners can rarely overcome the presumption of merits adjudication. *Johnson v. Williams*, 568 U.S. 289, 304 (2013). *Johnson* teaches that *Harrington*'s presumption applies when "there are circumstances in which a line of state precedent is viewed as fully incorporating a related federal constitutional right." *Id.* at

298. The *Johnson* Court offers as examples California's right to be present at trial, Massachusetts's standard for racial discrimination in jury selection, Minnesota's right to due process of law, and Kansas's Confrontation Clause as examples where a state has fully incorporated a federal constitutional right. *See id.* at 298-99.

As stated above, the Sixth Circuit has held that in Ohio, the statutory and constitutional right to a speedy trial are "not 'substantially different' from" the federal analysis, and "can be seen as merely [Ohio]'s method of applying that Supreme Court precedent in a more structured manner." *Brown*, 656 F.3d at 330. Ohio state courts note similarly. *See Selvage*, 687 N.E.2d at 435 ("[t]he Ohio Constitution provides similar protection" to the Sixth Amendment); *see also Butler*, 249 N.E.2d at 820; *State v. O'Brien*, 516 N.E.2d 218, 220 (Ohio 1987); *State v. Pachay*, 416 N.E.2d 589, 591 (Ohio 1980) (holding Ohio's "speedy trial statutes implement the constitutional guarantee of a public speedy trial"). The Sixth Circuit also reasoned:

> Ohio courts have recognized that "there may be situations wherein the statutes do not adequately afford the protection guaranteed by the federal and state constitutions, in which case it is [their] duty to see that an accused receives the protection of the higher authority." Thus, any time an Ohio court reviews the implementation of a speedy trial statute, it is guided not just by those provisions, but also by the dictates of the Sixth Amendment whether or not it expressly applies the factors laid out in *Barker*.

*Brown*, 656 F.3d at 331 (internal citations omitted, alteration in original).

Thus, when the Sixth District decided the merits of Mr. Hopings's statutory speedy-trial claim, this Court can presume under *Harrington* that it also decided the merits of his Ohio and federal constitutional claims. *See Brown*, 656 F.3d at 328-29 (applying *Harrington* to presume from the Ohio court's analysis of statutory speedy-trial claim that the Ohio court decided the merits of federal speedy-trial claim and thus the decision was entitled to AEDPA deference). I thus review

46

Mr. Hopings's federal speedy-trial claim with AEDPA deference to the Sixth District's decision. This means I inquire whether the Sixth District's decision was "contrary" to federal law, meaning it was "diametrically different," "opposite in character or nature," "mutually opposed," or "substantially different from the relevant [Supreme Court] precedent." *Brown*, 656 F.3d at 330 (cleaned up).

The relevant Supreme Court precedent for federal speedy-trial claims is *Barker v. Wingo*, 407 U.S. 514 (1972). There, the Court laid out a four-factor balancing test to determine whether a person's Sixth Amendment right to a speedy trial has been violated. *Id.* at 530. A court must weigh at least: (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant. *Id.* No single factor is a "necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id.* at 533. The first factor is the "triggering mechanism": unless the delay is "presumptively prejudicial," the other factors need not be examined. *Id.* The Supreme Court has noted that a delay of one year is typically enough to trigger an inquiry under *Barker. See Doggett*, 505 U.S. at 652 n.1.

In deciding Mr. Hopings's Ohio statutory speedy-trial claim, the Sixth District found:

{¶59} It is undisputed that appellant was held in jail in lieu of bail for 277 days during the pendency of case No. 2017-2020. It is also undisputed that appellant was held in jail in lieu of bail for 146 days following his arrest and up to the commencement of his trial in case No. CR 2019-2802. Combined, appellant was held in jail in lieu of bail for 423 days. Because appellant was held in jail in lieu of bail, the triple counting provision in R.C. 2945.72(E) applies. The state, then, was obligated to bring appellant to trial within 90 days of his original indictment. Appellant has established a prima facie case showing that his speedy trial time elapsed as his trial did not commence until 423 days after his original indictment. We therefore must analyze what portion of the elapsed time is chargeable to appellant or to the state to determine whether appellant's speedy-trial rights have been violated.

{¶60} In case No. CR-2017-2020, appellant was initially held in custody for 45 days from June 17, 2017 until his scheduled August 1, 2017 trial date. As no extension or waiver applies to this time, all 45 days are chargeable to the state. On his initial trial date, appellant requested a continuance which the trial court granted. Appellant's trial was continued to September 12, 2017. Appellant requested two subsequent continuances until his trial was ultimately rescheduled to November 28, 2017. The total time elapsed from appellant's first requested continuance until his November 28, 2017 trial date was 119 days. Because appellant requested these continuances, all of these 119 days are chargeable to appellant pursuant to R.C. 2945.72(H) and are not counted toward the time appellant was required to be brought to trial under R.C. 2945.71.

{¶61} On November 28, 2017, the state requested a continuance of appellant's trial. On that date, the state informed the trial court that L.S. would be unable to participate at trial as she was engaged in inpatient mental health treatment. The state explained that the treatment was necessary due to the victim's continued suicidal ideations and that until the juvenile court determined she could be transported from treatment, she would be unable to appear for trial. Over appellant's objection, the trial court granted the state's request and the matter was reset for trial on January 30, 2018. A total of 68 days elapsed from the state's request for a continuance and the rescheduled trial date.

{¶62} Appellant argues that because he objected to the request, and because the trial court did not make a specific finding that the request was reasonable, that these days are chargeable to the state. We disagree. Appellant is correct that the trial court's entry does not identify the bases on which it granted the continuance. If the journal entry does not contain the reason for the continuance, the reviewing court can look to other evidence in the record to determine whether the continuance was reasonable. Thus, the trial court's omission of the reasonableness of the state's request is immaterial and this court reviews whether a continuance was reasonable, and therefore not chargeable to the state against appellant's speedy-trial rights, based on the facts and circumstances of the case. Having reviewed the record, we find that the state's request was reasonable. The state provided a specific basis for its request— L.S.'s continued mental health treatment—and explained that steps had been taken through filings in the juvenile court to avoid requesting the continuance. Based on these circumstances, we find that the state's request for a 68-day continuance was reasonable and that the time elapsed does not run against the state's statutory speedy-trial obligations pursuant to R.C. 2945.72(H).

{¶63} Case No. CR 2017-2020 was dismissed, without prejudice, on January 30, 2018. For the foregoing reasons, we find that only 45 of the 227 days appellant was held in jail in lieu of bail during that time were chargeable to the state under R.C. 2945.71.

48

{¶64} Upon refiling of the charges under case No. CR 2019-2802 on October 16, 2019, the state's obligation to bring appellant to trial within 90 days of his original indictment resumed. 14 days later, at an October 30, 2019 pretrial, appellant signed a waiver of his speedy-trial rights and consented to a trial date of January 7, 2020. The initial 14 days in which appellant was in custody are chargeable to the state. However, appellant's valid waiver of his speedy-trial rights for a period of 69 days precluded that time from being applied toward the state's time constraints under R.C. 2945.71.

{¶65} Between January 7, 2020 and the commencement of appellant's trial on March 10, 2020, the trial court granted three more continuances. Appellant requested two of those continuances, each lasting 21 days. Pursuant to R.C. 2945.72(H), these 42 days were chargeable to appellant. On January 28, 2020, the state made its final request for a continuance because L.S. had undergone a medical procedure which prohibited her from appearing. We find that the state's request was reasonable as, again, it was premised on L.S.'s inability to appear for a legitimate medical reason. Further, appellant's own requests for two, 21-day continuances during this same time period, the same amount requested by the state, reflects the reasonableness of the state's request. As a result, we find that none of the 63 days which elapsed between January 7, 2020 and March 10, 2020, are chargeable to the state's statutory obligation to commence appellant's trial within 90 days pursuant to R.C. 2945.71.

{¶66} Appellant's trial in case No. CR 2019-2802 commenced on March 10, 2020. At that time, he had been held in jail in lieu of bail from the date of his reindictment until his trial, a period of 146 days. We find that only 14 of those days were chargeable to the state as all other continuances were either requested by appellant, were the result of appellant's valid, signed waiver of his speedy trial rights, or were the result of a reasonable request for continuance by the state pursuant to R.C. 2945.72(H). Combined with the 45 days chargeable to the state from case No. 2017-2020, appellant was held in jail in lieu of bail for an aggregate period of 59 days chargeable against his speedy-trial rights from the date of his initial 2017 arrest and the commencement of his trial. Therefore, the state met its burden to bring appellant to trial within 90 days as required by R.C. 2945.71. As a result, we find appellant's third assignment of error not well-taken.

(ECF #16-1 at PageID 1133-39) (citations and quotation marks omitted).

Nothing in the Sixth District's determination is an unreasonable application of the *Barker v. Wingo* four-factor balancing test. The Sixth Circuit in *Brown* has held that the tolling procedure in Revised Code § 2945.72 and the periods it might attribute delay to the defendant are not contrary to *Barker. See Brown*, 656 F.3d at 330-31. The Sixth Circuit found each *Barker* factor

present in the statutory scheme: First, the tolling provisions "take[] into account many of the considerations behind the second and fourth *Barker* factors, *i.e.*, the reason for the delay and the prejudice to the defendant." *Id.* at 331. Next, the total time limit for bringing an accused for trial in Revised Code § 2945.71 accounts for the total length of the delay. *Id.* Finally, Revised Code § 2945.73(B)'s requirement that a defendant bring a motion to discharge on speedy-trial grounds at trial requires the defendant to assert his right to a speedy trial. *Id.* Thus, a proper application of Ohio's speedy-trial statute does not violate the Sixth Amendment.

Moreover, all four *Barker* factors appear in the Sixth District's reasoning. First, the Sixth District considered the length of the delay, the "triggering mechanism," *Barker*, 470 U.S. at 530, which is measured by the entire duration of pretrial detention, no matter who is responsible for the delay in getting to trial. *Mapes v. Stegall*, 427 F.3d 1020, 1026 (6th Cir. 2005). One year is presumed to satisfy this factor, *Doggett*, 505 U.S. at 652 n.1, and the Sixth District concluded it was "undisputed" that Mr. Hopings was in pretrial detention for 423 days until his trial, *i.e.*, well over a year. (ECF #16-1 at PageID 1136). The Sixth District concluded in line with the one-year trigger under the federal analysis that Mr. Hopings made "a prima facie case showing that his speedy trial time elapsed." (*Id.*).

Second, the Sixth District considered the reason for the delay by parsing whether time should be charged to the State or to Mr. Hopings under Revised Code § 2945.72's tolling provisions. The Supreme Court has explained that different reasons for delay should be given different weights, with deliberate delays weighed more heavily and valid delays less heavily. *Barker*, 407 U.S. at 531. The purpose of analyzing the reasons for the delay is determining which party is more to blame for the delay. *Maples*, 427 F.3d at 1026. The Sixth District concluded the delay

occurred for two reasons: Mr. Hopings requested a continuance, or the State requested a continuance because the victim was unavailable to testify or be present at court. (*See* ECF #16-1 at PageID 1136-37). While *Barker* assessed the reasons the State may want a delay, it did not expressly address when a defendant requests a continuance. But it was not an unreasonable application of *Barker* for the Sixth District to apply all of Mr. Hopings's continuances against him as the purpose of the second factor is to determine "whether the government or the criminal defendant is more to blame for [the] delay." *Doggett,* 505 U.S. at 651.

Mr. Hopings argues the Court should charge his continuances to the State because he did not knowingly waive time (ECF #11 at PageID 72-73) and his counsel requested the continuances without his consent. (ECF #24 at PageID 1397). I disagree. While there is an indication that Mr. Hopings's counsel sought continuances against Mr. Hopings's wishes (*see* ECF #15-2 at PageID 543), this does not mean the time for those continuances should be charged to the State. The Supreme Court has held the defendant is charged for a delay caused by the defendant's counsel because "the attorney is the [defendant's] agent when acting, or failing to act, in furtherance of the litigation." *Vermont v. Brillon*, 556 U.S. 81, 90-91 (2009). Even were this Court to hold that the time from unauthorized continuances is not attributable to Mr. Hopings, the delay must still be attributable to the State to be counted. Just as "[a]n assigned counsel's failure 'to move the case forward' does not warrant attribution of delay to the State," *Id.* at 92, a defense attorney's unauthorized delay for their own purposes would not be attributable to the State either.

The Sixth District also did not unreasonably apply *Barker* in not charging the State for the delay while L.S. was unavailable to testify. *Barker* expressly provides "a valid reason, such as a missing witness, should serve to justify appropriate delay" and is not attributable to the

government. 407 U.S. at 531. Mr. Hopings asserts—without substantiation—that the State engaged in games of "hide the witness" and "forcibly confined [L.S.] . . . to deprive the defense of access to the witness prior to trial and to provide the prosecutor with the opportunity to intimidate, harass, threaten, and further indoctrinate the recanting witness." (ECF #24 at PageID 1397). Indeed, under *Barker*, a "deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government." 407 U.S. at 531. But nothing in the record supports Mr. Hopings's conclusory claims of a conspiracy and prosecutorial misconduct. Nor is there any indication that the State's explanations for L.S.'s inability to testify—inpatient mental-health treatment (ECF #15 at PageID 132) and recovering from an outpatient medical proceeding (ECF #15-2 at PageID 527)—were untrue.

For the third factor, the Sixth District considered Mr. Hopings's assertion of his speedy-trial right by considering Mr. Hopings's objection to the State's first requested continuance under the first indictment. (ECF #16-1 at PageID 1137). The Sixth District also noted that Mr. Hopings had requested multiple continuances at various stages, including a separate speedy-trial waiver and multiple continuances after the second indictment. (*See id.* at PageID 1138-39).

For the fourth factor, the Sixth District did not expressly consider the prejudice to the defendant while undertaking the Ohio law analysis. But its conclusion was not contrary to federal law. As the Sixth District had considered the amount of delay that could be attributed to each party and noted that Mr. Hopings had asserted his speedy-trial rights but continued to request continuances, the Sixth District did not act contrary to federal law in concluding that Mr. Hopings's speedy-trial rights were not violated. *See United States v. Oriedo*, 498 F.3d 593, 601 (7th Cir. 2007) (holding that the defendant did not demonstrate a denial of his Sixth Amendment

right to a speedy trial, where, even though the delay was substantial and the defendant was detained pretrial for three years, the fault for the delay was shared and the defendant continued to request continuances following his assertion for the right to a speedy trial).

Thus, the Sixth District's decision was not contrary to *Barker*. The court considered the total delay first and determined it to be over the one-year presumption before reaching any other determinations, in line with the structure of *Barker*. The court then parsed whether the State or Mr. Hopings was responsible for different portions of the total delay and noted that Mr. Hopings had executed written speedy-trial waivers and requested multiple continuances. While the Sixth District did not decide the extent Mr. Hopings was prejudiced by the delay, that was not contrary to federal law as the other three *Barker* factors each revealed Mr. Hopings's speedy-trial rights were not violated.

Thus, I recommend the District Court **DENY** Ground Three as meritless.

### CERTIFICATE OF APPEALABILITY

A habeas petitioner may not appeal the denial of an application for a writ of habeas corpus unless a judge issues a COA and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court has determined a petitioner's constitutional claim to lack merit, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong" before receiving a COA. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason

would find it debatable whether (1) the petition states a valid claim of the denial of a constitutional right and (2) the district court was correct in its procedural ruling. *Id.* A showing that the appeal would succeed on the claim is not needed to grant a COA. *Miller-El*, 537 U.S. at 337.

Here, jurists of reason could not find it debatable whether Mr. Hopings has made a substantial showing of the denial of a constitutional right. Therefore, I recommend the District Court **DENY** Mr. Hopings a COA as to all grounds for relief.

## Conclusion and Recommendation

For these reasons, I recommend the District Court **DISMISS** portions of Ground One and the entirety of Ground Four as procedurally defaulted, **DENY** the rest of Ground One and the entirety of Ground Two and Three as meritless, **DISMISS** Mr. Hopings's habeas petition, and **DENY** Mr. Hopings a certificate of appealability.

Dated: January 16, 2025

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## Objections, Review, and Appeal

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or**

whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).